[No. 34264. Department Two. February 6, 1958.]

ROBERT PRYAL, *Respondent*, v. NICK MARDESICH *et al.*, *Appellants.*[1]

[1] Reported in 321 P. (2d) 269.

*Evans, McLaren, Lane, Powell & Beeks*, for appellants.

*Roy E. Jackson* and *Max R. Nicolai*, for respondent.

DONWORTH, J.—This action was brought to recover damages for personal injuries sustained by a seaman who was seriously injured while employed as a member of the crew of the "North Star," a large freezer vessel, which was owned and operated by appellants.

The complaint alleged two causes of action, but on this appeal we are concerned only with the first, in which it was asserted that the injuries were caused (1) by negligence (under the Jones act, 46 U. S. C. A. 688) in certain specifically alleged respects, and (2) by unseaworthiness under maritime law. The answer denied the material allegations of the complaint, except plaintiff's employment as a seaman on the vessel, and asserted two affirmative defenses: That plaintiff's injuries were proximately caused by (1) his sole negligence, and (2) his own contributory negligence.

The case was tried to the court, sitting with a jury. At the close of plaintiff's evidence, the court withdrew the issue of unseaworthiness from the jury's consideration, and the trial proceeded on the remaining issues. The jury answered six special interrogatories, in which it found that plaintiff's total damages amounted to $30,000, that his contributory negligence was twenty-five per cent responsible for his injuries, and, accordingly, it rendered a verdict for plaintiff in the sum of $22,500.

Defendants' motion for judgment n.o.v. was denied, and judgment was entered on the verdict. Defendants have appealed therefrom.

The evidence is in conflict regarding the manner in which respondent received his injuries, but since the verdict was in respondent's favor, we must assume that the jury chose to believe the evidence introduced in support of the allegations contained in the complaint. There was substantial evidence from which the jury could have found the following factual situation:

Respondent, an experienced seaman and mechanic, was employed by appellants in June, 1955, as a member of the crew of the "North Star," the mother ship of many gill net fishing boats. He was sent by plane to a point on the Naknek river in Alaska to prepare a number of gill net boats for operation during the 1955 fishing season, which opened at noon on June 25th. While there, respondent used gill net boat No. 9 as his living quarters and base of operations. The mother ship, "North Star," sailed from Seattle and arrived in Bristol Bay on June 23, 1955, where it anchored for the duration of the fishing season. Appellant August Mardesich assumed command of the vessel, and thereafter directed all operations in connection with the fishing mission.

On June 24, 1955, respondent was met at Naknek by members of the crew of the "North Star," who took the gill net boats (except No. 9) out to the "North Star's" anchorage. One Dwyer took charge of No. 9, aboard which were respondent's tools and spare parts.

Respondent proceeded to the "North Star," arriving on the evening of June 24th. He immediately went to bed. The next morning respondent started to work, preparing the gill net boats for fishing. Dwyer arrived at the "North Star" with No. 9 about 10:30 a. m., and tied that boat to the port side of the "North Star" near the stern. He boarded the vessel and immediately advised respondent of his arrival with the tools and other equipment. Respondent asked Myers, another mechanic, to assist him in removing the tools and equipment from No. 9 and placing them on board the vessel.

Number 9 was about thirty feet long, having a short forward deck, aft of which was a cabin with a catwalk approximately twelve and one half inches wide on each side. Respondent and Myers descended the Jacob's ladder to the forward deck at the bow of No. 9, which was pitching and rolling in heavy seas and banging against the "North Star." They walked aft along the port or outboard catwalk. Respondent was wearing rubber boots, and the spray was breaking over the decks of the gill net boat. Myers, after

entering the cabin, passed the boxes of tools and equipment out to respondent, who stood outside, received the boxes, and placed them on top of the cabin.

It became necessary to push the boxes further forward on top of the cabin to make room for others, so respondent stepped up on the starboard or inboard catwalk to accomplish this. His feet slipped out from under him as he was pushing on the boxes, and he fell, with his right leg slipping between the "North Star" and the gill net boat. At that moment, a wave brought the gill net boat up sharply against the side of the "North Star," pinning the plaintiff's leg and injuring him. While attempting to pull his leg back into the gill net boat, respondent put his hand on the catwalk and discovered some oil on it. Up until this moment, neither respondent nor Myers had seen any oil on No. 9.

Respondent testified as to the cause of his fall: "I think it was pushing the box that made my feet slip." The position in which respondent had placed himself when he stepped up on the starboard catwalk of No. 9 was between its cabin and the side of the "North Star." He had been cautioned that this place was dangerous, and he knew that it was a place of peril.

On the day preceding the accident (June 24th), under the direction of appellant August Mardesich, the crew of the "North Star" had begun the operation of pumping spare fuel oil from the brine tanks, located on the main deck of the vessel near its stern, into the main fuel tanks. After pumping out most of the fuel oil, they purged the residue from the brine tanks by refilling them with salt water and allowing the oil and salt water mixture to overflow the sides of the tank and onto the deck of the "North Star." When respondent was injured, this mixture was being discharged off the deck of the "North Star" through port and starboard scuppers and limber holes into the sea. One scupper, through which the mixture was being discharged, was in the general area where No. 9 tied up.

This purging of the brine tanks continued for several days after the operation began, during which time the deck of

the ship, in the vicinity of the brine tanks, was wet and oily. Some of this mixture ran immediately off the deck of the "North Star" through the scuppers or limber holes, and part of it was delayed in reaching these outlets because of lumber piled on deck and the presence of many truck tires. This gear also obstructed access to the drain plug on the port brine tank (which otherwise could have been used in flushing the tank) and the passageway on the port side of the main deck. There is evidence of other debris on the main deck, which clogged the scuppers.

Under the condition described above, when the ship would roll back and forth from port to starboard in the heavy seas, the oil and water mixture would wash across the deck, and most of it was discharged out of the scuppers with some force.

The "North Star" carried the above mentioned fenders to protect the mother ship and the gill net boats from damage by chafing and working against the sides of each other in rough seas. There were some fenders over the side of the "North Star" on the starboard side and along the port side forward. No witness recalled having seen any fenders at the particular point where No. 9 was tied up.

The greatest length of time that elapsed between the arrival of No. 9 and respondent's injury was estimated to be fifteen to twenty minutes. Neither Myers nor respondent was aware of the purging of the brine tanks. Dwyer had no knowledge that the brine tanks were being purged when he tied No. 9 to the "North Star." The presence of oil on the catwalk of No. 9 when respondent was injured, was due to the purging of the brine tanks on the "North Star" with water and the resultant escape thereof through the scuppers or limber holes. The oil and water could have been carried onto the catwalk of No. 9 either by the spray and waves that were washing over the catwalk, or it could have drained directly on the catwalk from the vessel.

At the conclusion of respondent's case, the trial court withdrew from the jury the issue of appellant's liability for the alleged unseaworthiness of either the vessel or the gill

net boat, but submitted the case to the jury solely upon the issue of employer negligence as established by the proof. Hence, the liability of appellants was predicated entirely upon their failure (through the acts of their managing partner, August Mardesich, who at the time of respondent's injury was directing the operation of the fishing expedition) to exercise the requisite standard of care, *i.e.*, that which a reasonably prudent captain (or master) should have done, or refrained from doing, under similar circumstances. *Roberts v. United Fisheries Vessels* Co., 141 F. (2d) 288 (1944), cert. den., 323 U. S. 753, 89 L. Ed. 603, 65 S. Ct. 81.

In substance, the alleged negligence of appellants consisted of their failure to provide respondent with a safe place to work, in permitting oil to wash onto the deck of the "North Star" and over the side onto the deck of No. 9, causing an oily, unsafe condition on No. 9; in permitting the deck of No. 9 to become oily and greasy; and in failing to provide fenders for respondent's protection. The jury's verdict indicates a finding of substandard care by appellants in one or more of the alleged particulars.

Several assignments of error relate to appellant's challenge to the sufficiency of the evidence at the close of respondent's case. By electing to introduce evidence in their own behalf, appellants waived their motion and assumed the risk of supplying proof without which respondent's proof would otherwise have been deficient. *Petersen v. Department of Labor & Industries,* 40 Wn. (2d) 635, 641, 245 P. (2d) 1161 (1952). We must, therefore, consider the entire record.

Appellants next contend that the court erred in denying their motion for a directed verdict for several reasons.

First, they assert that no evidence was introduced from which the jury could find that appellants had notice—actual or constructive—of the alleged transitory dangerous condition existing aboard No. 9, the place of respondent's fall. Appellants argue that the fifteen-to-twenty-minute interval between the arrival of No. 9 alongside of the "North Star" and respondent's fall was not a sufficient period of time

either to charge them with constructive notice of the presence of No. 9, or to afford them a reasonable opportunity to remedy the alleged oily condition.

To support their position, appellants have directed our attention to many decisions of the Federal courts bearing upon the liability of employers (shipowners) for injuries sustained by employees (seamen) resulting from slipping and falling upon decks and/or from ladders, aboard ship, due to the presence of various foreign substances thereon. Among these cases are *Adamowski v. Gulf Oil Corp.*, 197 F. (2d) 523 (1952); *Williams v. Tide Water Associated Oil Co.*, 227 F. (2d) 791 (1955); and *Cookingham v. United States*, 184 F. (2d) 213 (1950).

In each of the cited cases, the negligence of the owner of the vessel was predicated upon the alleged failure of the respective ship's officers to remedy an unsafe condition existing either on deck, caused by spilled oil (*Adamowski* and *Williams* cases), or on a stairway, caused by the presence of some slippery substance, apparently Jello (*Cookingham* case). The rule in such cases, that the plaintiff must show that the defendant knew, or should have known, of the unsafe condition so that defendant could have discovered and corrected it, is, we think, inapplicable to the factual situation confronting us.

■ Here, appellants' liability is based, not upon their failure to remove the oil from the deck of No. 9, but upon their acts which resulted in the creation of a hazardous condition aboard No. 9 under the then existing circumstances, which are described above. Stated another way, appellants' liability arose because of their negligence in permitting the deck of No. 9 to become slippery, rather than in failing to remedy the slippery condition thereof after they knew, or should have known, of its existence.

Appellant August Mardesich had ordered the purging of the brine tanks. He was directing the entire fishing expedition, and, on the morning of June 25th, knew that No. 9 had not arrived at the "North Star" the preceding day as had the other gill net boats. Mr. Dwyer's arrival was anticipated.

Both No. 9 and the "North Star" were but a single maritime unit in the sense that No. 9 was not an unexpected foreign visitor, but was an integral part of the fishing operation in which appellants were engaged. It was expected to arrive at the "North Star" during the morning of June 25th and tie up somewhere alongside.

As to his reason for tying No. 9 at the precise position alongside the mother ship, Mr. Dwyer testified, in part:

"We secured the boat in port aft as close as possible to the only place we could secure, as I recall, for the purpose of unloading these supplies. . . .

"I don't recall why I tied up there—to get as close as possible to an unloading point, but it was either the downwind side or that is the only place we could tie."

Mr. DeBay, a retired naval officer, employed by appellants, testified that there were only "two fuel stations back on the port and starboard side aft" of the "North Star" where the gill net boats could take on fuel. His direct examination reads, in part, as follows:

"Q. And what would happen to those gill-net boats that were tied up alongside there, fueling or taking on nets and supplies?. A. Well, everytime the ship would roll and discharge any water through the limber holes or scuppers, why, some of that oil would get on the decks of the gill-net boats and they were complaining about it all the while we were up there. Q. Now, was anything done there by anybody, that is, any of the management or anybody that was in charge of the crew there aboard that ship, do anything to remedy that thing when you first arrived up there or up to the morning of June 25th? A. Well, the Union had a meeting there on the 24th and they complained about the oil being on the gill-net boats but there was nothing done about it. We continued to wash the decks down and let the water run over the side. . . . Q. What would have been—what could have been done there, Mr. DeBay, to prohibit this oil and water going onto the gill net boats after you started pumping out those tanks? A. Well, the oil should never have been floated over the side in the first place. They had gasoline pumps, they could have got a suction and pumped all that oil into the ships' tanks then washed the tanks out with a detergent and cleared the portside or the starboardside,

whichever way the list was, and washed it over the side and they wouldn't have had any trouble."

The foregoing testimony, if believed by the jury, would justify the inference that appellants, through their managing partner, August Mardesich, knew, or should have known, of the arrival of No. 9, and the approximate position at which it would tie up alongside the "North Star."

There is testimony that the deck of No. 9 was oily; that the source of that oil was the afterdeck of the "North Star"; and that respondent's fall was caused by his foot slipping on the oily deck of No. 9. We think that, under the circumstances described in the testimony, the question of appellants' negligence in permitting the deck of No. 9 to become hazardous was properly submitted to the jury.

Appellants also contend that there was no evidence presented upon which the jury could find that the absence of fenders was the proximate cause or one of the proximate causes of respondent's injury.

Two witnesses testified that fenders serve a twofold purpose. They provide protection for crewmen as well as prevent the chafing of one boat against another. Although the fall sustained by respondent was not attributable to the absence of fenders, it is quite possible that the presence of such fenders between the "North Star" and No. 9 would have protected the respondent from injury, or at least reduced the extent of such injury.

There were approximately one hundred rubber tires aboard the "North Star" which were to be tied and suspended over the sides of the "North Star." Yet, there was none suspended in the immediate area where No. 9 was tied up. Under such circumstances, the issue of appellants' negligence in this respect was also a jury question.

■ Appellants complain that the trial court erred in submitting the case to the jury on the issue of appellants' failure to warn the crew members of the "North Star" not to go aboard boats tied up at the particular point beneath the scuppers, through which oily water was being discharged from the deck of the "North Star."

The only mention of this theory of negligence was made by the trial court, in the absence of the jury, in ruling upon appellants' challenge to the sufficiency of the evidence at the close of respondent's case. No instruction was proposed or given concerning it, and appellant has not assigned error to any instruction given or proposed and refused. We cannot assume that the jury based their verdict upon some theory of negligence mentioned by the trial court in their absence, and upon which they were not instructed.

The United States supreme court, in the recent case of *Ferguson v. Moore-McCormack Lines*, 352 U. S. 521, 523, 1 L. Ed. (2d) 511, 515, 77 S. Ct. 457, 458 (1957), said:

"Since the standard of liability under the Jones Act is that established by Congress under the Federal Employers' Liability Act [45 USCA §§ 51 *et seq.*], what we said in *Rogers v. Missouri Pacific R. Co., ante*, p. 500 [1 L. Ed. (2d) 493, 499, 77 S. Ct. 443, 448 (1957)], decided this day, is relevant here:

"'Under this statute the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought.'"

A review of the evidence in this case convinces us that it satisfies the test approved by the supreme court in the case last mentioned. We therefore conclude that the issues of appellants' negligence and respondent's contributory negligence and proximate cause were correctly submitted to the jury for its determination under appropriate instructions.

For the reasons above stated, the trial court did not err in denying appellants' motion for judgment n.o.v., and we are unable to find merit in appellants' remaining assignments of error.

The judgment entered on the jury's verdict is affirmed.

HILL, C. J., ROSELLINI, WEAVER, and HUNTER, JJ., concur.